1  LUKENS LAW GROUP
   WILLIAM M. LUKENS (SBN 037196)
2  JENNIFER L. JONAK (SBN 191323)
   One Maritime Plaza, Suite 1600
3  San Francisco, CA 94111
   Telephone: (415) 433-3000
4  Facsimile: (415) 781-1034

ORIGINAL FILED

JUL 18 2008



RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

5  Attorneys for Plaintiff

6
7            UNITED STATES DISTRICT COURT
8            NORTHERN DISTRICT OF CALIFORNIA
9
10

11  WILLIAM E. GUSTASHAW, JR., on his
    own behalf and on behalf of all others
12  similarly situated,

13            Plaintiff,

14       v.

15  BAYERISCHE HYPO-UND
    VEREINSBANK AG, a corporation; HVB
16  U.S. FINANCE, INC., a corporation;
    CHENERY ASSOCIATES, a general
17  partnership; SUSSEX FINANCIAL
    ENTERPRISES, INC., a California
18  corporation; and DOES ONE THROUGH
    TEN, inclusive;
19
20            Defendants.

CV Case No. 

3479
RMW
HRL

**COMPLAINT FOR VIOLATION OF RICO, FRAUD, AND UNFAIR BUSINESS PRACTICES**

**DEMAND FOR JURY TRIAL**

21
22
23
24
25
26
27
28

COMPLAINT

1    Plaintiff William E. Gustashaw, Jr., on behalf of himself and all others similarly
2  situated (the "Class" or "Class Members") file this Complaint, alleging as follows:

3                              **JURISDICTION AND VENUE**

4         1.      This is an action for damages arising out of defendants' violations
5  of Sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations
6  Act of 1970 (18 U.S.C. §§ 1961 *et seq.*) ("RICO"), fraud, conspiracy, inducing breach of
7  fiduciary duty, and unjust enrichment.

8         2.      The Court has jurisdiction over the subject matter of this action
9  pursuant to 28 U.S.C. § 1331 because the RICO claim raises a question of federal law, and
10  under 28 U.S.C. § 1367 because the remaining state law claims are so related to the RICO
11  claim that they form a part of the same case or controversy and fall within this Court's
12  supplemental jurisdiction. This Court also has jurisdiction over the subject matter of this
13  action pursuant to 28 U.S.C. 1332(d) because the claims of all plaintiffs aggregated
14  together, exceed $5 million, and at least one Plaintiff is diverse from at least one
15  Defendant.

16         3.      Venue is proper in the Northern District of California pursuant to
17  28 U.S.C. § 1965(a) because the defendants are found, reside and/or transact affairs in this
18  District; pursuant to 18 U.S.C. § 1965(b) because the ends of justice require that the
19  parties residing in any other district be brought before this Court; pursuant to 28 U.S.C. §
20  1291(b) because a substantial part of the events or omissions giving rise to this action
21  occurred in this District; and/or pursuant to 28 U.S.C. § 1391(b) because one or more of
22  the defendants is found in and is subject to personal jurisdiction in this District.

23                                    **PARTIES**

24         4.      Plaintiff William Gustashaw is an individual residing at all relevant
25  times within the United States. He was induced to enter into the CARDS Facility. The
26  members of the class are referred to as the "Class" or as "Class Members."

27         5.      Defendant Bayerische Hypo-Und Vereinsbank AG d/b/a HVB
28  Group ("HVB Group") is a German corporation and one of the largest banks in the world

1  with its principal place of business located in Munich, Germany. On information and

2  belief, it is involved in international banking and investment transactions, including

3  transactions throughout the United States, including the Northern District of California. It

4  also purposefully directed its tax shelter activities complained of herein toward Class

5  Members who are residents of California, and otherwise established contacts with

6  California in participating in the CARDS transactions and the Enterprise, as described

7  below.

8          6.      Defendant HVB U.S. Finance, Inc., formerly known as HVB

9  Structured Finance, Inc., is a corporation offering banking and credit services with its

10  principal place of business located in New York, New York. On information and belief, it

11  is a United States affiliate of the HVB Group and handles banking and financial

12  transactions throughout the U.S., including the Northern District of California. It also

13  purposefully directed its tax shelter activities complained of herein toward Class Members

14  who are residents of California and otherwise established contacts with California in

15  participating in the CARDS transactions and the Enterprise, as described below.

16          7.      Domenick Mario DeGiorgio is an individual who, at all relevant

17  times, acted as Managing Director of the United States operations of HVB Group and

18  Vice President of the Structured Finance Group of HVB Structured Finance, Inc. At all

19  relevant times, Plaintiff is informed and believes and therefore alleges that Mr.

20  DeGiorgio's principal place of business and residence was and is in New York and that at

21  all relevant times, he transacted business within the Northern District of California.

22  (Hereinafter, all of the HVB defendants and Mr. DeGiorgio will be referred to collectively

23  as "HVB.")

24          8.      Plaintiff is informed and believes and therefore alleges that

25  defendant Chenery Associates is and has been a general partnership or association formed

26  in California whose principal place of business has been located at all relevant times in the

27  City and County of San Francisco.

28          9.      Plaintiff is informed and believes and therefore alleges that

COMPLAINT
3

1   defendant Sussex Financial Enterprises, Inc. is and has been, at all relevant times, a

2   corporation formed under and by virtue of the laws of the State of California, whose

3   principal place of business has been located at all relevant times in the City and County of

4   San Francisco.  Plaintiff is informed and believes and therefore alleges that Chenery

5   Associates and Sussex Financial Enterprises, Inc. transacted and continue to transact

6   business in the City and County of San Francisco.  Chenery Associates and Sussex

7   Financial Enterprises, Inc. will be referred to collectively in this Complaint as "Chenery."

8           10.    Plaintiff is informed and believes and therefore alleges that the

9   defendants engaged in a large number of tax schemes similar to the one at issue herein,

10  and, in doing so, acted in concert according to a prearranged and commonly understood

11  and accepted plan or scheme.  In so doing, Plaintiff is informed and believes and therefore

12  alleges that the defendants were acting mutually and as agents of one another, and

13  established an ongoing organization for the purpose of generating fees from their tax

14  avoidance schemes.  Plaintiff is informed and believes and therefore alleges that these

15  various entities and individuals functioned as a continuing unit (referred to collectively as

16  the "CARDS promoters").

17          11.    The CARDS promoters had a decision-making structure by which

18  they formulated and determined how to promote their tax schemes, including the CARDS

19  Facility.  Plaintiff is uncertain of the true names and capacities of certain individuals or

20  entities that may be liable for the damages alleged herein and therefore sues them by

21  fictitious names of Does ONE through TEN.  Plaintiff will amend his complaint by

22  asserting their true names, capacities and appropriate charging allegations when they are

23  ascertained.

24                          **GENERAL ALLEGATIONS**

25          12.    Plaintiff brings this action, seeking compensatory damages

26  according to proof, trebled under RICO, and related relief, against HVB and Chenery and

27  for their role in promoting and implementing numerous tax strategies that the federal

28  government has found to be unregistered tax shelters, including one known as the

1   "CARDS facility," and inducing Plaintiff and the Class Members to purchase and utilize

2   the CARDS facility tax strategy on the premise that the strategy was lawful. CARDS has

3   been rejected by federal and state tax agencies, as the Defendants knew it would be.

4           13.     Plaintiff is informed and believes and therefore alleges that in or

5   about 1999, or earlier, when HVB still maintained an office in the State of California,

6   HVB entered into an arrangement with other tax shelter promoters to market and promote

7   various fraudulent tax strategies, one of which became dubbed the CARDS facility, in

8   order to generate huge fees. HVB arranged for financial advisory and investment firms

9   headquartered in San Francisco, California, to identify and then solicit potential

10  participants, like Plaintiff and the Class Members, who were induced to engage in

11  CARDS and pay the defendants large fees by misrepresentations and legal advice that the

12  defendants knew were improper and not disinterested.

13          14.     On information and belief, in the course of this tax shelter activity,

14  HVB engaged in numerous communications by mail, electronic mail, facsimile and

15  telephone with individuals and entities in the Northern District of California, including

16  Presidio Advisory Services ("Presidio") and Chenery. This included contacts from at least

17  1999 onward with John Larson and Kerry Bratton of Presidio, in San Francisco,

18  California, as well as contacts from 2000 onward with Chenery, including Roy Hahn, in

19  San Francisco, California.

20          15.     On information and belief, the CARDS facility was first conceived

21  by Chenery in San Francisco, California. On information and belief, the banks with

22  whom the CARDS transactions were sold – Deutsche Bank AG d/b/a Banker's Trust and

23  Deutsche Bank Securities, Inc. (together, "Deutsche Bank") and HVB – also helped refine

24  and design the structure of the CARDS transactions. On information and belief, these

25  banks dealt primarily with Chenery, located in San Francisco, California.

26          16.     In helping structure and develop the CARDS Facility transactions,

27  HVB engaged in numerous communications with individuals and entities in the Northern

28  District of California, including individuals from Chenery Associates of San Francisco,

1  California. For example, HVB personnel, including Domenick DeGiorgio and Bill Tsai,

2  engaged in hundreds of telephone calls with Roy Hahn of Chenery Associates in San

3  Francisco, California relating to the design, marketing, and implementation of the CARDS

4  Facility from fall of 2000 through 2001. HVB personnel also engaged in numerous

5  communications with Chenery, including Roy Hahn, by facsimile, electronic mail and

6  mail in San Francisco, California, all of which were part of HVB's marketing, structuring

7  and implementation of the CARDS Facility.

8       17.    Starting in 2000, Chenery and HVB marketed the CARDS Facility

9  to Plaintiff and other Class Members. Plaintiff is informed and believes and therefore

10  alleges that the promotional materials for the CARDS Facility that were presented to him

11  and the Class Members were created and developed in the State of California. The

12  CARDS Facility was also described to Plaintiff and the Class Members, and they were

13  induced to purchase it, through materials passed along by HVB officers and employees

14  and Chenery. These materials omitted to disclose that, in fact, the transaction was one

15  that defendants knew would not be accepted by the IRS for income tax purposes and

16  would, instead, be considered an illegal tax shelter. Plaintiff and the Class were therefore

17  misinformed and misled about the nature and soundness of the CARDS facility.

18       18.    In fact, the CARDS facility was nothing more than a sham

19  transaction designed by the defendants to "create" paper losses for income tax purposes,

20  and Plaintiff is informed and believes and therefore alleges that all of the defendants knew

21  that the CARDS facility was a sham transaction that would not generate any profits and

22  would not be recognized by federal or state taxing authorities for income tax purposes.

23       19.    Plaintiff is informed and believes and therefore alleges that Roy

24  Hahn, one of the founders and a principal of Chenery, developed and promoted the

25  CARDS facility in San Francisco, California, with the assistance of HVB. Plaintiff is

26  informed and believes and therefore alleges that said founders met on numerous

27  occasions, with officers of HVB in order to develop and refine the scheme and its tax

28  related attributes, including but not limited to meetings with Domenick DeGiorgio, Bill

1    Tsai, Richard Pankuch and Sylvie DeMetrio, all of whom were officers and
2    representatives of HVB and had substantial and essential roles in the transactions. At the
3    meetings with HVB, Plaintiff is informed and believes and therefore alleges that HVB
4    assisted in formulating the manner in which a taxable event would be created and a
5    method by which HVB promissory notes would be utilized for the purpose of creating
6    assets that could be purportedly sold at a loss so that a large tax benefit could be claimed
7    on behalf of the taxpayers who participated in the program. This included telephone calls
8    with officers and employees of Chenery in San Francisco, California, including a
9    telephone call in or about Columbus Day of October 2000 between Roy Hahn and Bill
10    Tsai in San Francisco during which HVB and Chenery reviewed the documents that
11    would be used for the HVB CARDS transactions.

12            20.    This also included three days of meetings at the Auberge Du Soleil
13    in Napa, California, located in the Northern District of California, at which HVB
14    executives and officers met with the CARDS Facility promoters, including Bill Tsai,
15    Domenick DeGiorgio, Richard Pankuch, Sylvie DeMetrio and Alexander Nouvakhov, to
16    discuss marketing, structuring and implementation of the CARDS Facility and other tax
17    shelter transactions. The Napa meetings occurred in or about January or February of
18    2001. Cynthia Morelli and Graham Taylor of LeBoeuf Lamb Green & MacRae LLP's
19    San Francisco offices and Frank Tirelli, Phil Groves and Frank DiFerdinando of myCFO,
20    Inc.'s California offices also attended the Napa retreat and met with the HVB officers and
21    executives to discuss structuring, marketing and implementing the CARDS Facility and
22    other tax shelters to other taxpayers, including California clients and other Class
23    Members.

24            21.    HVB executives and officers also met with myCFO, Inc., a
25    financial advisor located in San Francisco, California, that promoted CARDS to numerous
26    of its clients, during the last quarter of 2000 in California to discuss the CARDS
27    transactions.

28            22.    HVB was originally introduced to Chenery through William Boyle,

1  an officer of Deutsche Bank, who advised Roy Hahn of Chenery that Deutsche Bank did

2  not want to engage in any more CARDS programs. Mr. Boyle suggested that Chenery

3  instead engage in additional CARDS transactions with HVB, a bank with whom Deutsche

4  Bank had previously worked on tax shelter transactions. Mr. Boyle also advised Mr.

5  Hahn of Chenery that, with prior tax shelter transactions, Deutsche Bank had done one set

6  of transactions and HVB would "do the second set." On information and belief, the banks

7  shared information and documents for the CARDS Facility transactions.

8         23.    On information and belief, HVB sold CARDS programs to

9  approximately 29 different clients and purposefully directed its tax shelter activities

10 complained of herein toward residents of California, knowing that the fraudulent tax

11 shelters would have an impact on the CARDS clients' state tax returns, as well as federal

12 tax returns. HVB sold at least three CARDS Facility transactions to California residents,

13 two of which were sold to residents of the Northern District of California. The two

14 Northern District of California CARDS transactions were $41 million and $5.8 million

15 transactions. Although HVB's "clients" on certain of its CARDS documents were listed

16 as "shell" limited liability companies, in fact, the real clients were the taxpayers, who

17 were individuals and residents of California. HVB knew in these transactions that the

18 actual clients were California residents, because HVB engaged in "Know Your Client"

19 procedures that included obtaining detailed information about each taxpayer client,

20 including their home address and state of residence. As a result, HVB knew that the

21 transactions, which it had helped structure to "shelter" taxes, would impact these

22 California residents' state income taxes and have a substantial impact on California tax

23 returns and revenues paid to the Franchise Tax Board of the State of California.

24         24.    HVB also understood the tax shelter implications of the CARDS

25 Facility, because its outside counsel, Shearman & Sterling, including one of Shearman &

26 Sterling's tax law senior partners, engaged in several calls with the other CARDS

27 promoters, including Chenery. These calls occurred in September and October of 2000,

28 and during them, HVB and/or Shearman & Sterling specifically discussed the tax aspects

1  of the CARDS Facility transaction and whether CARDS transactions had to be registered
2  as tax shelters. In December 2000, drafts of letters and other documents were negotiated
3  and exchanged between Shearman & Sterling, representing HVB, and Chenery. All
4  documents delivered to Chenery were sent to its San Francisco offices and all drafts from
5  Chenery were sent from its San Francisco offices. During the course of these
6  negotiations, Shearman & Sterling and HVB made it clear that they understood that the
7  IRS "would not like" the CARDS transactions.

8           25.    Ultimately, Plaintiff is informed and believes that HVB failed to
9  register any of the CARDS transactions in which it engaged, despite the fact that
10  approximately 14 or 15 other CARDS transactions, including ones implemented by
11  Deutsche Bank, were registered as tax shelters from December 29, 1999 through January
12  10, 2001. One of the earliest CARDS transactions, the IAL transaction, was also
13  registered as a tax shelter. On information and belief, HVB must have known that these
14  prior CARDS transactions were registered as tax shelters, since it copied extensively from
15  Deutsche Bank's transactional documents in creating its own CARDS transactional
16  documents, yet HVB did not register or advise any of its own clients about these tax
17  shelter registrations, including Mr. Gustashaw and the Class Members. Plaintiff is
18  informed and believes that Chenery was also advised by Thomas Durham of Mayer
19  Brown & Platt that the tax shelter transactions it was engaged in during or about
20  December 2000 likely had to be registered as tax shelters under the IRS regulations.

21           26.    HVB also engaged in numerous other tax shelters, including BLIPS
22  and NPL/Lippo transactions, at least four of which were sold to California residents, at
23  least one of whom was also a resident of the Northern District of California. On
24  information and belief, these other tax shelters also involved transactions with millions of
25  dollars in purported loans and millions in fees, and HVB engaged in the same "Know
26  Your Client" procedures for these transactions that made it aware that it was engaging in
27  activity that would have a direct impact on California residents and on the payment of
28  California state taxes. For certain of these other transactions, HVB provided numerous

1  "fairness" opinion letters that it delivered by mail to Chenery in San Francisco, California

2  and myCFO in Redwood City, California, to induce taxpayers to purchase the tax shelters,

3  including opinion letters and documents sent in August 2001 signed by Domenick

4  DeGiorgio. It also engaged in electronic mail and other correspondence delivered to

5  individuals of Presidio in San Francisco, California regarding the tax shelter transactions,

6  including a December 28, 1999 correspondence with Kerry Bratton (of Presidio), Amy

7  McCarthy (of HVB) and Alex Nouvakhov (of HVB), a September 14, 1999 memorandum

8  exchanged between Presidio of San Francisco, California and Domenick DeGiorgio of

9  HVB, a January 19, 2000 facsimile between Presidio of San Francisco and Alex

10  Nouvakhov at HVB, and other correspondence between Kerry Bratton of Presidio and

11  Alex Nouvakhov regarding "reversing" certain transactions to make them look as though

12  they did not occur at all. HVB further engaged in correspondence delivered to individuals

13  at Chenery from at least 2000 through 2002 regarding CARDS and other tax shelters,

14  including facsimiles sent from Sylvie DeMetrio of HVB to Chenery in December 2000, to

15  Cristi Holland and May Kwan (both of Chenery) in August 2002.

16          27.     The CARDS facility was promoted to Mr. Gustashaw and other

17  Class Members by telling them that a nationally renowned and prestigious law firm,

18  Sidley, had already reviewed the transaction and would provide an opinion letter

19  "blessing" the CARDS facility and confirming that the tax advantages would be

20  recognized by the Internal Revenue Service ("IRS") for income tax purposes.

21          28.     Plaintiff is informed and believes and therefore alleges that the

22  opinion letters issued by Sidley, although purporting to be issued on behalf of the

23  taxpayers as clients, were, in actuality, boilerplate letters that were generated in identical

24  form and substance to numerous other clients of the CARDS facility and similar artificial

25  basis transactions. Plaintiff is informed and believes and therefore alleges that an attorney

26  named R.J. Ruble, who was then a partner at Sidley, provided these opinion letters.

27  Plaintiff is informed and believes and therefore alleges that Sidley was paid a flat fee or

28  fee based on the size of the CARDS transaction, as opposed to an hourly fee, for

COMPLAINT
10

1   providing the opinion letters in the amount of $125,000 to $250,000 per letter. Plaintiff is

2   informed and believes and therefore alleges that, since the opinion letters were merely

3   reproduced in identical substance for each taxpayer that participated in the CARDS

4   facility, the provision of opinion letters for the CARDS transactions were a substantial

5   source of revenue to Sidley. Plaintiff is informed and believes and therefore alleges that

6   the CARDS promoters were all aware of Sidley's vested interest in the promotion of the

7   CARDS facility.

8        29.    Mr. Ruble also entered into a license agreement with Chenery dated

9   May 19, 1998, which referred to the "CARDS facility" as a "proprietary technology that

10  potentially yields users who purchase assets certain tax, financial, accounting or other

11  commercial benefits." Mr. Ruble, acting on behalf of Sidley, agreed to "license" the

12  CARDS "technology" to Chenery to exploit on a worldwide basis for a period of 48

13  months in exchange for the payment of 20% of all fees paid to Chenery. The 20% share

14  would be paid as an "under the table" kickback fee for each CARDS transaction to Family

15  Investment Statutory Trust, a personal trust created for the benefit of Mr. Ruble. On

16  information and belief, defendants were aware or should have been aware of this licensing

17  agreement, yet none of the defendants, including Chenery, ever disclosed the existence of

18  this or its obvious conflict of interest to Mr. Gustashaw or the Class Members.

19       30.    Based upon the advice and promotional efforts of the CARDS

20  promoters, including HVB's documentation and passed along representations falsely

21  describing the CARDS Facility, and the opinion letters, draft opinions and advice

22  provided by Chenery and Sidley, Mr. Gustashaw and the Class Members signed, or

23  caused to be signed boilerplate documentation presented to them in connection with the

24  CARDS facility. This paperwork was voluminous, highly technical and legal in nature.

25  All of this paperwork was created by defendants with the express intention of promoting

26  and inducing Mr. Gustashaw and the Class Members to enter into a fraudulent tax shelter

27  that they knew to be designed to avoid the payment of lawfully due taxes, yet omitted to

28  disclose this to the Class Members.

1          31.    At no time did any of the defendants ever disclose to Mr.

2  Gustashaw or the Class Members that they were jointly active in promoting, marketing,

3  developing and/or facilitating the CARDS facility, nor did anyone ever disclose to Mr.

4  Gustashaw or the Class Members that the Sidley opinion letters were simply form letters

5  that had been mass-generated for each taxpayer that participated in the CARDS facility.

6          32.    HVB also failed to disclose to Mr. Gustashaw and the Class

7  Members that it had previously engaged in numerous tax shelter transactions and that in

8  August 2000, before Mr. Gustashaw and Class Members were induced to enter into their

9  CARDS transactions, "it became abundantly clear to the bank that the IRS had issues"

10  with certain of its prior tax shelter transactions, causing HVB to have to discontinue

11  offering BLIPS transactions. Rather than cease engaging in tax shelter transactions

12  altogether, HVB simply commenced marketing and selling CARDS transactions.

13          33.    As a result, in late 2000, Mr. Gustashaw purchased the CARDS

14  Facility. CARDS transactions were also sold to other Class Members from 2000-2001 by

15  HVB. HVB acted as the "lender" for these CARDS Facility transactions, and Mr.

16  Gustashaw and the Class Members received advance and final opinions from Sidley in

17  support of the legitimacy and lawfulness of their CARDS Facility. In giving its opinions,

18  Sidley appeared to be acting as counsel for Mr. Gustashaw and the other Class Members.

19  At no time did defendants disclose to any of the Class Members that the law firms were,

20  in fact, retained by defendants to provide boilerplate opinion letters, and were therefore

21  not providing independent advice. Defendants also failed to disclose that Sidley was

22  being induced to provide a favorable opinion of CARDS based upon the under the table

23  kickback fees paid to Mr. Ruble's personal trust by Chenery for each "successful"

24  CARDS transaction pursuant to the May 1998 licensing agreement.

25          34.    Mr. Gustashaw and the Class Members reasonably relied on the tax

26  advice, legal advice and professional services rendered by the CARDS promoters.

27          35.    The CARDS promoters knew and/or recklessly disregarded at the

28  time Sidley issued their opinion letters, and in developing, promoting and facilitating the

CARDS facility, that the CARDS transaction constituted a tax shelter within the meaning of Code Section 6111(c)(1), and that they were illegally promoting, and aiding and abetting the promotion, of an unregistered tax shelter. The CARDS promoters also knew and/or recklessly disregarded the impropriety of their promotion and facilitation of the CARDS facility, by providing statements concerning the allowability of any tax benefit obtained through participation in the CARDS facility even though defendants knew or had reason to know such statements were false, and by facilitating or providing a gross valuation overstatement concerning the tax and investment benefits of the CARDS facility, constituted a violation of I.R.C. § 6700.

36.     The defendants have also been involved in the development, creation and promotion of numerous other illegal or abusive tax shelters, including schemes known as ZENS, NPL, BOSS, Son-of-Boss, BLIPS, MIDCO, FLIPS, OPIS, TRACT, IDV and COBRA. On information and belief, each of these tax strategies was related for tax purposes to "listed transactions," transactions that are subject to the list maintenance requirements of Internal Revenue Code § 6111 because they have the potential for tax avoidance or evasion, listed in IRS regulations or notices. Each should have been registered as tax shelters pursuant to Internal Revenue Code § 6111(c), but the defendants did not register them.

37.     Between 1996 and 2003, HVB participated in over $3.5 billion worth of purported financing for tax shelter transactions that resulted in United States taxpayers claiming over $1,800,000,000 of false tax losses from these transactions. HVB "caused the drafting and execution of various documents that falsely and misleadingly described HVB's role in the tax shelter transactions" and caused HVB to receive and send through its bank accounts various funds related to the tax shelter transactions in which HVB was involved. HVB also conspired with others, including R.J. Ruble of Sidley, to participate "in a scheme to defraud the IRS by devising, marketing and implementing fraudulent tax shelters," including the CARDS Facility.

38.     Prior to the time that the CARDS facility was promoted to the

Class, the IRS had issued Notice 1999-59, published on or about December 27, 1999,
entitled "Tax Avoidance Using Distributions of Encumbered Property," and warning that
the IRS had become aware of certain types of transactions "being marketed to taxpayers
for the purpose of generating tax losses." IRS Notice 1999-59 warned that such
transactions consisted of a "contrived series of steps" by which "taxpayers claim tax
losses for capital outlays that they have in fact recovered." IRS Notice 1999-59 stated that
such "artificial losses" are not allowable for federal income tax purposes.

39.     On or about September 5, 2000, the IRS published Notice 2000-44,
entitled "Tax Avoidance Using Artificially High Basis," addressing similar transactions to
Notice 1999-59. Notice 2000-44 described a similar inflated basis transaction, concluding
that "purported losses from these transactions (and from any similar arrangements
designed to produce noneconomic tax losses by artificially overstating basis . . . ) are not
allowable as deductions for federal income tax purposes."

40.     In December 2000, there was published an article by Lee Sheppard
entitled "The Synthetic Euro Borrowing Tax Shelter" exposing the CARDS facility and
concluding that CARDS transactions did not have any economic substance for income tax
recognition purposes. On information and belief, defendants were aware of the Sheppard
article by late 2000 or early 2001, well before they closed or caused to be closed CARDS
transactions of the Class, but continued conducting and promoting CARDS anyway.

41.     As a result of IRS Notices 1999-59 and 2000-44, both of which
were issued prior to the opinion letters and agreement to enter into the Class Members'
CARDS transactions, as well as the Sheppard article, defendants knew that the CARDS
transaction was not a legitimate or legal means for declaring losses for income tax
purposes for the Class. Nevertheless, the defendants failed to inform the Class of the
illegality of the CARDS tax shelter scheme. The CARDS promoters also knew that their
promotion and facilitation of the CARDS facility, by providing statements concerning the
allowability of any tax benefit obtained through participation in the CARDS facility even
though defendants knew or had reason to know such statements were false, and by

facilitating or providing a gross valuation overstatement concerning the tax and

investment benefits of the CARDS facility, constituted a violation of I.R.C. § 6700.

42.    On or about March 18, 2002, the IRS issued Notice 2002-21, entitled "Tax Avoidance Using Inflated Basis," describing the CARDS transaction and listing it as a tax shelter, or transaction that is "not allowable for federal income tax purposes." On or about October 15, 2004, the IRS issued a Coordinated Issue Paper on the CARDS facility, concluding again that it was a sham transaction that is not allowable for federal income tax purposes. Neither of these publications, however, brought to light the role that the banks had played in the transaction or mentioned HVB or Chenery.

43.    Plaintiff's tax returns have since been audited by taxing authorities, with taxing authorities taking the position that declared losses from the CARDS facility are not allowable for income tax purposes. In addition, Plaintiff has been assessed penalties as a result of his CARDS Facility transaction.

44.    Plaintiff is informed and believes and therefore alleges that the CARDS promoters jointly developed, marketed, promoted, and/or facilitated the CARDS facility for the express purpose of receiving and splitting millions of dollars in fees from the Class Members. Plaintiff is informed and believes and therefore alleges the receipt of those fees was the sole motive in the development, marketing, promotion, facilitation and execution of the CARDS facility scheme. Plaintiff is informed and believes and therefore alleges that in jointly developing, marketing, promoting and/or facilitating the CARDS transaction, the CARDS promoters agreed that they would promote the CARDS Facility as it if was a lawful transaction, even though defendants knew that it was not likely to be recognized by the IRS for income tax purposes. The opinion letters and advice offered to the Class by defendants were not, therefore, "independent," insofar as the same advice and "form" opinion letters were issued to other taxpayers and Class Members for purposes of soliciting and collecting fees from the CARDS transactions. Plaintiff is informed and believes and therefore alleges that the receipt of fees and the pecuniary gain from those fees was the sole motive for defendants' conduct, as alleged herein. Plaintiff is informed

1   and believes and therefore alleges that this arrangement to develop and promote the

2   CARDS facility gave each of the participating defendants a significant pecuniary interest

3   in the advice and professional services that they rendered to Plaintiff, impairing the

4   exercise of the judgment and duty of care, loyalty and honesty that each defendant owed

5   to the Class.

6       45.     Plaintiff is informed and believes and therefore alleges that since at

7   least 2000 and continuing through at least 2002, defendants, using interstate mail,

8   circulated and exchanged boilerplate opinions, letters and promotional documents for the

9   CARDS facility tax shelters sold to the Class. HVB conspired with Chenery to issue these

10  false promotional materials to induce clients to purchase its fraudulent tax shelters,

11  including the CARDS Facility. Plaintiff is informed and believes and therefore alleges

12  that HVB and Chenery also caused wire transfers to be made in that same time period

13  related to the CARDS facility, which were instrumental to the CARDS facility. Plaintiff

14  is informed and believes and therefore alleges that the fees paid to all of the CARDS

15  facility promoters by the Class were received using interstate mail and wire facilities.

16      46.     HVB and Chenery have, on information and belief, cloaked the

17  identity of the clients receiving the aforementioned opinion letters in privilege and

18  confidentiality claims. Similarly, they have masked their use of the interstate mail and

19  wire facilities and their fraudulent conduct in similar claims.

20      47.     Plaintiff is informed and believes and therefore alleges that, under

21  the defendants' arrangement, the role of HVB included planning the structure to be used

22  in the sham transactions, providing purported financing to enable persons to participate in

23  tax shelters, including the making of fictitious loans to newly formed shell companies,

24  which had neither the capital nor the ability to service such loans, as a platform and

25  vehicle for the perpetration of the scheme on numerous persons who had potentially large

26  tax obligations which would have to be paid to the Internal Revenue Service and to the

27  State taxing authorities, depending on the location of the particular taxpayers. On

28  information and belief, HVB provided hundreds of millions of dollars for sham "loan"

1  transactions for the CARDS facility tax shelters alone, not including other tax shelters in

2  which it participated, including BLIPS, in which it used Deutsche Bank's transactional

3  documents as a model for that tax shelter. HVB's role also included providing a facade of

4  financial substance and purported third party sales so that the taxpayers could purport to

5  generate huge income tax losses, none of which would be the product of legitimate sales

6  or taxable events. HVB's role assisted in structuring the transactions so that they had a

7  semblance of economic reality but, as HVB knew, and as one of its principal officers has

8  admitted under oath in pleading guilty to a conspiracy to defraud the IRS with other

9  fraudulent tax shelter transactions, the CARDS facility transactions were a complete

10  sham. On information and belief, HVB also served as the counter-party or third party

11  purchaser, or facilitated such, on numerous transactions in which it engaged in order to

12  implement those shelters.

13          48.    HVB's CARDS transactions alone and the phony losses claimed

14  thereto resulted in the evasion of over $91 million in income taxes and fees to HVB of at

15  least $3.3 million. HVB knew that "CARDS was designed, marketed and implemented as

16  a series of pre-planned steps intended to generate phony tax losses in order to eliminate

17  income taxes for wealthy individuals or companies and, in exchange, to garner substantial,

18  guaranteed fees and income for HVB, certain co-conspirators, and others."

19          49.    Defendants never explained to the Class Members that IRS Notice

20  2002-21 impacted their CARDS Facility transactions or that their transactions would be

21  disallowed by taxing authorities as a result. Nor did they reveal any of the fraudulent

22  conduct in which they had participated as a part of Mr. Gustashaw's and other Class

23  Members' CARDS transactions. Consequently, there was no basis to suspect that any

24  wrongdoing had been committed in conjunction with the CARDS facility, including by

25  defendants, until the statement of admitted facts and deferred criminal prosecution

26  agreement of HVB dated February 13, 2006 in which HVB admitted wrongdoing in

27  conjunction with the CARDS facility.

28          50.    After the IRS issued Notice 1999-59 and Notice 2000-44, the

CARDS promoters continued marketing, promoting, facilitating and participating in such tax shelter sham programs, including CARDS and others that were devised by them as part of the defendants' arrangement, that fell within the scope of those notices and rulings. On information and belief, the CARDS promoters used the interstate mail and wire facilities to promote and market these tax shelters, to send their opinion letters and other communications, and to collect fees. The defendants' actions described herein pose the threat of continuing criminal activity, as they have continued their promotion of listed tax shelters even after IRS Notices questioning the shelters and/or similar transactions. On information and belief, the defendants' arrangements succeeded in generating many millions and millions of dollars in sham tax losses for dozens or more clients and taxpayers, causing those clients and taxpayers substantial damage and depriving the United States of millions of dollars in tax revenues.

51.    The defendants intentionally masked their arrangement and activities in the cloak of attorney-client privilege. They and their fellow participants corresponded and communicated with each other as clients individually and collectively so that the taxpayer clients would not know who else was participating in the shelters and could not know the deceptive nature and scope of the defendants' arrangements.

52.    Those who were involved in this CARDS scheme have now been investigated and criminally charged for their role in other fraudulent tax shelters. Yet the Class was never informed about any of the defendants' history with prior fraudulent tax shelters.

53.    The United States Senate Subcommittee studying tax shelters concluded that HVB "provided billions of dollars in lending critical to transactions which the banks knew were tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters . . ." Final Report, p. 7, 111. All of these HVB tax shelter transactions involved boilerplate opinion letters, like the ones given to the Class Members. Final Report, p. 55-56. This included numerous BLIPS transactions, which were predicate acts for the CARDS transaction sold to the Class, as well as

1   numerous other CARDS transactions, which were also predicate acts for the sale of the

2   CARDS facility to the Class. In 1999 and 2000, HVB did 29 BLIPS transactions,

3   providing "credit lines" that totaled about $2.5 billion. HVB received $5.45 million for

4   BLIPS transactions in less than 3 months in 1999, according to documents that it

5   produced to the Senate. Senate Report, p. 112, HVB credit request dated January 6, 2000,

6   Bates HVB 003320-30.

7        54.    Mr. DeGiorgio, the Directing Manager of the U.S. branch of HVB

8   Group and an officer of HVB, waived indictment and pled guilty on August 11, 2005 to

9   four counts of illegal conduct, including "participating in a conspiracy to defraud the

10  Internal Revenue Service involving tax shelter transactions promoted by and participated

11  in by [his] employer, Hypo und Vereinsban, HVB, including the tax shelter known as

12  BLIPS." (*United States v. DeGiorgio*, S.D.N.Y. 05-CR-853 BSJ). He also pled guilty to

13  violating another federal conspiracy statute for "participation in a conspiracy to defraud

14  the IRS involving the payment to various participants in tax shelter transactions of

15  compensation that was obtained through and as a result of certain tax shelter transactions

16  involving HVB and which compensation was not reported to the IRS by certain recipients

17  and payors of the compensation."

18       55.    Mr. DeGiorgio testified that he was employed by HVB from 1996

19  to 2003, during which time, he participated in the sale of numerous BLIPS transactions,

20  which he understood to "help wealthy clients of the BLIPS promoters to significantly

21  reduce their tax liability to the United States Internal Revenue Service." Mr. DeGiorgio

22  also described in his testimony how BLIPS was structured and that, like CARDS, it

23  involved "creating reported tax losses [based] on the bank purporting to provide a loan

24  structured in a particular way." Mr. DeGiorgio testified that "[t]he loan proposed by the

25  BLIPS promoters was a sham because, among other things, as designed, no money ever

26  left the bank and because HVB never set aside any of its own money or procured funds

27  from the banking market in order to fund any of these loans." Mr. DeGiorgio testified that

28  he was aware of these facts and aware that the supporting opinion letters drafted by the

1  same attorney at Sidley, R.J. Ruble, that was involved in the Class Members' CARDS

2  transaction, "falsely described [ ] these purported loans. . ." Mr. DeGiorgio further

3  testified that he and others caused HVB "to prepare and execute various false documents

4  that made it appear that HVB was providing real loans when in reality it was not." Mr.

5  DeGiorgio also testified to several other "false and misleading aspects of BLIPS that [he]

6  recognized to be false and misleading at the time," including the illusion that it was a

7  long-term program and the fact that it had no real investment or leveraged aspects. For his

8  work on these fraudulent tax shelters, Mr. DeGiorgio testified that he received undeclared

9  compensation from an unidentified tax shelter promoter based in California, which

10  Plaintiff believes to be Chenery.

11         56.    Both attorneys that provided opinion letters to taxpayers "blessing"

12  the CARDS Facility, R.J. Ruble of Sidley and Graham Taylor of LeBoeuf, have also been

13  indicted for their role in devising, marketing and implementing fraudulent and illegal tax

14  shelters. Mr. Ruble was indicted by a federal grand jury in the Southern District of New

15  York (*United States v. Stein, et al.*, S.D.N.Y. 05-CR 888 LAK), and Mr. Taylor was

16  indicted by a federal grand jury in Utah (*United States v. Evanson, et al.*, D. Utah 05-CR-

17  805 TC). No one ever disclosed to the Class their role in other fraudulent tax shelters

18  prior to the CARDS facility.

19         57.    On information and belief, Mr. Ruble was terminated as a partner

20  from Sidley in or about October 2003 for breaches of fiduciary duty. Prior to that time,

21  Mr. Ruble was a partner at Sidley and member of the firm's Executive Committee. On or

22  about November 20, 2003, Mr. Ruble was called to testify before the United States Senate

23  Subcommittee investigating tax shelters. Mr. Ruble invoked his Fifth Amendment right

24  against self-incrimination and declined to testify.

25         58.    The indictment naming Mr. Ruble also identifies several banks that

26  participated in certain of the named, fraudulent tax shelters, including "a foreign bank

27  with its principal United States branch located in New York, New York. . ." Plaintiff is

28  informed and believes and therefore alleges that one of the banks described in the

1   indictment is none other than HVB. The tax shelters described in the indictment and

2   superseding indictment are some of the same fraudulent tax shelters already described in

3   this complaint, including BLIPS. HVB was already identified by the U.S. Senate Report

4   on Tax Shelters as a bank that participated in and was instrumental to these tax shelters.

5        59.    According to the superseding indictment's description of the banks'

6   involvement, the BLIPS tax shelter, for example, involved "a series of pre-arranged

7   transactions that involved the client purportedly borrowing money from one of four banks

8   . . . . in order to make purported foreign currency investments including currencies that

9   were 'pegged' to the United States dollar. The bank involved in the purported loan also

10  served as the counterparty on all of the purported currency and other transactions . . . ."

11  (*United States v. Stein, et al.*, S.D.N.Y. 05-CR-888 LAK, pp. 17-18)

12       60.    The indictment goes on to describe, consistent with Mr.

13  DeGiorgio's testimony, how the BLIPS transactions    ". . . were shams – no money ever

14  left the bank and none of the banks assigned any capital cost to these purported BLIPS

15  loans. Indeed, at least two of the banks did not fund the loans at all – they neither set

16  aside from their own funds nor obtained from the market any money to cover these

17  purported 'loans' and 'loan premiums.' In addition the sham loans were not in any way

18  used in the purported 'investment' program involving trades relating to pegged currencies

19  but, instead, were used only to generate a phony tax loss. The only money used in making

20  and securing the trades involving pegged currencies as part of BLIPS was money

21  contributed by the client as part of the 7% all in cost." Plaintiff is informed and believes

22  and therefore alleges that one of the banks referred to in the superseding indictment that

23  participated in the sham loans is HVB, and that the conduct described here, in the Senate

24  Report and in Mr. DeGiorgio's testimony is similar to the sham nature of the CARDS

25  Facility transactions executed by HVB and Chenery.

26       61.    In or about February 2006, HVB entered into a Deferred

27  Prosecution Agreement pursuant to which it admitted various misconduct, including

28  participating in and implementing fraudulent tax shelter transactions, including CARDS

transactions. HVB further admitted that it engaged in conduct that was "unlawful and fraudulent" with respect to these illegal tax shelters, such as CARDS, by "agreeing to participate in fraudulent tax shelter transactions" and "preparing and signing false and fraudulent factual recitations, representations, and documents as part of the documentation underlying the shelters." This documentation, which fraudulently omitted disclosing the truth as to CARDS – that it was an abusive tax shelter, that the defendants had jointly developed it, that it had to be registered as a tax shelter, and that the opinion letters were boilerplate and meaningless – induced the Class to purchase CARDS and perpetrated a fraud that was not exposed until HVB's admissions of wrongdoing.

62.    Plaintiff brings this action on his own behalf and, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of himself and the nationwide class of all persons who, between 1999 and 2003, entered into transactions known as CARDS in which HVB and Chenery were involved. Excluded from the Class are the defendants or any person, firm, trust, corporation, officer, director or other individual or entity in which a defendant has a controlling interest or which is related to or affiliated with the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

63.    The claims of Plaintiff and the members of the Class have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent scheme perpetrated by defendants, and arise from substantively identical transactions entered into on the basis of substantively identical representations by HVB and the other defendants. Indeed, HVB has admitted that it had the same role for every single CARDS transaction in which it was involved. If brought and prosecuted individually, each Class Member would necessarily be required to prove the instant claims upon the same material and substantive facts, upon the same remedial theories, and would be seeking the same relief, resulting in duplication and waste of judicial resources. Each Class Member would also have to present thousands of pages of documents for an extremely complex set of transactions that are identical in substance to every other Class

1    Member, requiring the Court and the parties to undergo unnecessary duplication and waste

2    of judicial economy, which will be avoided if these claims are tried together as a Class.

3         64.    The members of the Class are numerous such that joinder of all

4    members is impracticable and/or would result in the duplication and waste of judicial

5    resources described above.

6         65.    Common questions of law and fact exist as to all members of the

7    Class and predominate over any questions solely affecting individual members of the

8    Class. Among the questions of law and fact common to the Class are: (a) whether

9    Defendants made false and misleading statements or omissions to the Class Members in

10   connection with the CARDS Facility; (b) whether Defendants engaged in any acts that

11   operated as a fraud or deceit on the Class Members; (c) whether Defendants engaged in

12   predicate acts of wrongdoing under the RICO statutes; (d) whether Defendants used

13   interstate mails and wires to carry out the CARDS Facility transactions sold to the Class

14   Members; (e) whether Defendants' acts proximately caused injury to the Class or

15   irreparably harmed the Class, and if so, the appropriate relief to which the Class is

16   entitled; and (f) whether Defendants' acts constitute violations of law for which the Class

17   is entitled to recover damages and/or other relief.

18        66.    The prosecution of separate actions by members of the Class would

19   also create a risk of inconsistent or varying adjudications with respect to members of the

20   Class who are similarly situated.

21        67.    Plaintiff as an individual has engaged counsel experienced in

22   complex class litigation and litigation regarding the CARDS Facility transactions.

23   Plaintiff will fairly and adequately represent the interests of the Class, and his interests are

24   co-extensive with and not antagonistic to those of the absent members of the Class.

25        68.    The Class Members should not and cannot reasonably be expected

26   to litigate this matter individually. Whether litigated individually or as a class, the causes

27   of action asserted in this Complaint involved extremely complex issues of law and will

28   likely require extensive factual discovery that may include the production of millions of

1   pages of documents, particularly if this case proceeds to trial. The costs of successfully

2   prosecuting such litigation would be a burden on the resources of most Class Members,

3   especially since Class Members owe or have had to pay substantial sums to the IRS as a

4   result of the fraudulent tax shelters sold to them by Defendants. In addition, the enormous

5   amounts of discovery, complex transactions and highly complex issues of law would

6   create a burden upon the Court in having to adjudicate separate actions for each of the

7   Class Members.

8                                **FIRST CAUSE OF ACTION**

9                                            **RICO**

10                                  **(Against All Defendants)**

11          69.     Plaintiff reasserts and incorporates by reference all of the foregoing

12   allegations in their entirety and further alleges:

13          70.     The defendants' arrangement described herein constitutes an

14   ongoing organization, with an ascertainable structure and purpose beyond the predicate

15   acts and the conspiracy to commit such acts, by which the defendants function as a

16   continuing unit comprised of said defendants.

17          71.     The defendants associated themselves with each other to form an

18   ongoing organization and enterprise (the "Enterprise") for the purpose of promoting and

19   selling various tax schemes for many millions of dollars. The defendants knew that many

20   of these tax schemes in which they developed and promoted with the help of co-

21   conspirators, including ZENS, NPL/Lippo, BOSS, Son-of-Boss, BLIPS, MIDCO, FLIPS,

22   OPIS, TRACT, IDV and COBRA, and the CARDS scheme set forth above, were likely to

23   be challenged by the tax authorities and/or contrary to law. The defendants engaged in,

24   and its activities affected, interstate commerce, including the provision of legal,

25   accounting, tax, financial and investment services across state lines. HVB specifically

26   engaged or attempted to engage in financial transactions knowing that the property

27   constituted proceeds derived from unlawful activity, namely, the marketing and selling of

28   fraudulent tax shelters, that the proceeds were derived from that unlawful activity, that the

1  transaction was conducted with the intent to promote the unlawful activity through

2  fraudulently sheltering monies from federal and state income taxes, and knowing that the

3  transactions were designed to avoid the reporting of said taxes and the reporting and

4  registration of said transactions as tax shelters, as required by law. These transactions also

5  involved commercial bribery in violation of California law, because the illegal kickback

6  arrangement between Mr. Ruble and Mr. Hahn involved an illegal offense committed with

7  each and every CARDS transaction. The transactions also involved interstate

8  communications and transportation as part of the scheme to engage in fraudulent tax

9  shelters.

10          72.    The defendants conducted or participated in the conduct of the

11  Enterprise's affairs through a pattern of racketeering activity consisting of, *inter alia*,

12  more than two acts of mail fraud, wire fraud, interstate transportation in aid of

13  racketeering, money laundering,  engaging in transactions in property derived from

14  unlawful activity, transportation of fraudulently obtained monies, and bribery (in violation

15  of 18 U.S.C. §§ 1341, 1343, 1952, 1956, 1957, and 2314 and California Penal Code

16  Section 641.3(a),respectively.).  As part of this pattern, continuing over the course of

17  years, by using the mails, private interstate carriers and interstate wire communications,

18  said defendants, through their Enterprise, sold these and other fraudulent tax schemes to

19  Class Members, beginning as early as 1999-2000. In particular, without limitation, in

20  violation of 18 U.S.C. §§ 1341 and 1343, defendants employed the Postal Service and/or

21  private or commercial interstate carriers and/or interstate wire communications to send

22  their retainer letters, invoices, opinion letters, tax advice, and investment advice to Class

23  Members, and to receive from Class Members payments of defendants' fees, all as set

24  forth above. On information and belief, the defendants functioned as a continuing unit

25  and had a decision-making structure by which they formulated and decided how to

26  promote, implement and conceal various tax strategies, including the CARDS Facility.

27          73.    On information and belief, defendants also engaged in monetary

28  transactions in violation of 18 U.S.C. §§ 1956 and 1957, by knowingly engaging or

1  attempting to engage in the monetary transactions with the unlawfully derived proceeds of

2  the CARDS facility and other tax shelter transactions described herein with the intent to

3  promote their tax shelter schemes, evade and defeat taxes, conceal or disguise the nature

4  or control of the proceeds, and to avoid transaction reporting requirements under state and

5  federal law. The value of the criminally derived property with which defendants engaged

6  in these transactions was greater than $10,000.  On information and belief, the CARDS

7  Facility tax shelter transactions also generated proceeds for defendants with which they

8  and other CARDS promoters intended to carry on unlawful activity, and defendants

9  knowingly designed, developed and/or facilitated the CARDS tax shelter to conceal or

10  disguise the nature of the proceeds of this unlawful activity, representing it to be a

11  legitimate business activity and credit facility instead of an unlawful attempt to evade

12  income taxes, and avoiding reporting the CARDS transactions as tax shelters.  On

13  information and belief, the defendants promoted the CARDS transactions and conducted

14  or helped conduct the financial transactions that were a part of the CARDS facility tax

15  shelter, transporting, transmitting and/or transferring funds from the United States to a

16  place outside of the United States for the unlawful purpose of promoting, facilitating and

17  failing to register unlawful tax shelters.

18       74.    Each defendant's conduct as set forth herein was in concert with

19  each of the other defendant's conduct, and planned and arranged with and known by each

20  of the other said defendants pursuant to said defendants' common scheme to sell and

21  conceal fraudulent tax strategies for millions of dollars.

22       75.    The defendants' conduct of the Enterprise and their pattern of

23  racketeering activity commenced in the mid to late 1990's, well before when they and

24  other CARDS promoters first contacted Class Members to solicit their participation in the

25  CARDS scheme and continues through the present, when the defendants continue to

26  communicate with taxpayers, using interstate mail and wire facilities, but not to reveal and

27  in fact conceal the full extent of said defendants' racketeering conduct.

28       76.    The defendants' conduct of the Enterprise and their pattern of

1 racketeering activity were not limited to the acts involving Plaintiff but included acts
2 directed to many other Class Members and other taxpayers, including numerous other
3 criminal schemes consisting of other tax shelters. Said defendants engaged in numerous
4 other predicate acts by utilizing the collective resources of the members to prepare dozens
5 of other customized CARDS transactions for numerous other taxpayers, in which each
6 transaction was structured specially for the purpose of extracting large confiscatory fees
7 from a large cross section of clients, specifically customizing each of the transactions so
8 that they were unique to each victim, and forming for each such transaction, using the
9 same basic *modus operandi*, a separate limited liability company for the purpose of
10 making a sham loan and then formulating a basis for the transaction in an amount that was
11 equal to the size of the loan, thereby providing a separate and distinctive unit of activity
12 on which another sham CARDS transaction could be formed. The same CARDS
13 promoters also sold completely different tax shelters on which they continued to extort
14 large set-up fees and commissions based on transactions that were of little or no economic
15 benefit to the taxpayer, and which were represented as legitimate ways by which each
16 taxpayer could minimize or eliminate his tax obligations. On information and belief,
17 Defendants have continued to engage in racketeering activity designed to promote illegal
18 tax shelters, and to disguise and hide the illegal nature of their prior acts, posing the threat
19 of continuing criminal activity and have continued to oppose the efforts of the United
20 States Government and the Internal Revenue Service to curb such activities, and have
21 fomented the filing of frivolous lawsuits for the purpose of delaying the collection of taxes
22 from other taxpayers who have purchased the customized CARDS programs, including
23 but not limited to an action pending in the U.S. District Court, California Northern District
24 (San Jose) entitled *Neil R. Douglas and Christine R. Douglas, plaintiffs, v. United States*
25 *of America, defendant*, CO3 04518 JW, knowing that the only purpose of the filing of
26 such actions would be to delay and attempt to discourage the Government from collecting
27 the taxes owed, and to prevent the Internal Revenue Service from successfully policing
28 tax laws and collecting penalties and interest with respect to the sham transactions.

77.    The defendants' conduct violated 18 U.S.C. §§ 1962(c) and 1962(d), because the Class Members' CARDS Facility transactions did not involve the purchase or sale of a security.

78.    Were it not for the defendants' unlawful conduct in promoting, facilitating, misrepresenting and concealing the business purpose and legality of the CARDS facility, the Class Members would not have entered into the CARDS facility transactions, and would not have incurred the fees that were paid for the CARDS Facility, as well as millions of dollars in back taxes, interest and penalties as a result of the disallowance by federal and state taxing authorities of the CARDS facility and the loss of use of funds and joint defense fees related thereto.

79.    As a direct and proximate result of the foregoing conduct by defendants, the Class has been damaged in the amount of the fees paid for the CARDS Facility transactions; millions of dollars in back taxes, interest and penalties payable to taxing authorities as a result of the disallowance of the CARDS Facility; the attorneys' fees and other costs incurred by Class Members as a result of defendants' conduct; the loss of use of funds; and such other damages as the Class has sustained and will continue to sustain in an amount to be determined at trial.

80.    The Class and the public are threatened with loss and injury and/or irreparable harm due to Defendants' violation of the RICO laws.

81.    As a proximate cause of the foregoing, the Class has been injured in the manner described above, with the amount to be according to proof, said amount to be trebled and awarded against defendants, jointly and severally, plus attorneys' fees and costs, as well as the declaratory relief sought herein.

## SECOND CAUSE OF ACTION

### Fraud

### (Against All Defendants)

82.    Plaintiff reasserts and incorporates by reference all of the foregoing general allegations in their entirety and further alleges:

83. In order to induce the Class Members to pay fees for the CARDS transaction, the defendants made numerous knowingly misleading representations and intentional omissions of material fact to Plaintiff, including, but not limited to: failing to disclose that the CARDS transaction would not entitle a taxpayer to claim for income tax purposes losses recognized from the transaction; failing to disclose existing published authority, including notices published by the IRS, that purported losses arising from similar transactions are not allowable for income tax purposes; promoting and developing a transaction while knowing that it was not likely to be allowable for income tax purposes; promoting the CARDS Facility as a legitimate transaction, when in fact, it was nothing more than a sham transaction designed to create artificial, paper losses for tax purposes; concealing the manner in which the CARDS Facility worked; concealing the illegal nature of the CARDS Facility, including the impact of the IRS notice listing it as an abusive tax shelter; failing to disclose that HVB had helped to develop and design the CARDS Facility; failing to disclose that HVB was not acting as an "independent" bank but was operating together with the other defendants; failing to disclose that the opinion letters were not issue independently and were nothing more than boilerplate opinions designed to induce the Class Members to enter into the CARDS Facility transaction; failing to disclose that the authors of these opinion letters had a pecuniary interest in the CARDS transaction and had helped to develop and/or promote the transaction; and failing to disclose that the CARDS transactions had to be registered as tax shelters, but were not.

84. The above affirmative representations, or material and intentional omissions of fact, made by the defendants were false when made and said defendants knew them to be false when made with the intention that Class Members rely upon them in entering into the CARDS transaction, so that the defendants could reap millions of dollars in fees from the transaction.

85. As a result of the foregoing, the Class has been injured by the fees and commissions charged for the transaction, the loss of use of funds caused by the early payment of taxes, the loss of investments which were owned by Class Members, and such

1  other damages as the Class has sustained and will continue to sustain in an amount to be

2  determined at trial.

3        **86.**    Plaintiff is informed and believes and on that basis alleges that the

4  defendants' conduct was willful, malicious, reckless, wanton and in knowing disregard of

5  their professional obligations, such that the Class is entitled to recover exemplary damages

6  against the defendants in an amount to be determined at trial.

7  **THIRD CAUSE OF ACTION**

8  **Unfair Business Practices, Cal. Bus. & Prof. Code § 17200**

9  **(Against All Defendants)**

10        87.    Plaintiff reasserts and incorporates by reference all of the foregoing

11  general allegations in their entirety and further alleges:

12        88.    The Unfair Business Practices Act defines unfair business

13  competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.

14  California Business & Professions Code §17200 *et seq.*

15        89.    Defendants have violated the Unfair Business Practices Act by

16  engaging in the unlawful, unfair and/or fraudulent business acts and/or practices alleged

17  herein, including the promotion, facilitating, concealment and/or sale of the CARDS

18  facility, a transaction that they knew or should have known would be disallowed by the

19  IRS as a tax shelter, and would be likely to deceive the Class, thereby depriving the public

20  of millions of dollars of tax monies and deceiving taxpaying members of the public into

21  participating in an illegal tax shelter, as well as violating the various laws already cited

22  herein, as well as the Bank Company Holding Act of 1940.

23        90.    As a result of the foregoing, the Class has been injured by the fees

24  and commissions charged for the transaction, the loss of use of funds caused by the early

25  payment of taxes, the loss of investments which were owned by Class Members, the back

26  taxes, interest and penalties resulting from the disallowance of the CARDS Facility, and

27  such other damages as the Class has sustained and will continue to sustain in an amount to

28  be determined at trial.

1        91.    The Unfair Business Practices Act provides for restitution for

2  violations. Plaintiff thereby requests that this Court restore all monies and fees paid by all

3  of the Class Members related to the CARDS transaction.

4                      **PRAYER FOR RELIEF**

5        WHEREFORE, Plaintiff and the Class hereby demand a trial by jury and

6  seek relief and judgment against defendants as follows:

7        1.    Against all Defendants, jointly and severally, for actual damages in

8  an amount to be proven at trial, said amount to be trebled, plus attorneys' fees and costs,

9  for violation of RICO, 18 U.S.C. § 1962.

10        2.    Against all Defendants, an injunction enjoining Defendants from

11  engaging in the same types of conduct or endeavor alleged herein; devising, offering and

12  soliciting clients for, or promoting, tax shelters; preparing tax returns involving tax

13  shelters; providing legal advice promoting tax shelters; soliciting clients for, referring

14  clients to, or engaging in marketing or business development programs, with each other;

15  sharing fees or income with each other; committing any acts of mail fraud or wire fraud;

16  soliciting or promoting frivolous actions against the Government for refunds or otherwise

17  for the purpose of frustrating or defeating the collection of legitimate taxes; violating the

18  RICO laws; and an order requiring Defendants to divest themselves of any interest, direct

19  or indirect, in the Enterprise, and dissolving the Enterprise;

20        3.    Against all defendants, a declaration that Defendants are jointly and

21  severally liable to the Class for any and all commissions paid, back taxes, interest, and

22  penalties assessed in the past or future resulting from the Class Members' participation in

23  the CARDS program, for the loss of use of funds to the Class, and for all professional fees

24  incurred by the Class Members in the past or the future to rectify Defendants'

25  wrongdoing, all such amounts to be trebled under RICO;

26        4.    Against all Defendants, jointly and severally, for attorneys' fees and

27  costs to the maximum extent provided by any applicable provision of law, including

28  RICO;

1            5.    Against all Defendants for restitution of all fees and commissions

2    paid by the Class; and

3            6.    For such other and further relief as the Court may deem just or

4    proper.

5

6    Dated:  July 18, 2008

7                               LUKENS LAW GROUP
                           WILLIAM M. LUKENS (State Bar No. 037196)

8                               JENNIFER L. JONAK (State Bar No. 191323)

9

10                       By: _____

11                            Attorneys for Plaintiff William Gustashaw, Jr.
                         and the Proposed Class

12

13                   **JURY TRIAL IS HEREBY DEMANDED**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28